IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARI HARPER,** | ) CIV F 06-893 AWI DLB |
| Plaintiff, | ) |
| | ) **ORDER ON PLAINTIFF'S** |
| v. | ) **MOTION FOR PARTIAL** |
| | ) **SUMMARY JUDGMENT** |
| **UNUM LIFE INSURANCE COMPANY** | ) |
| **OF AMERICA,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

This is an Employee Retirement Insurance Security Act ("ERISA"), 29 U.S.C. § 1001 et. seq., case that was removed from state court by Defendant UNUM Life Insurance Company of America ("Unum"). Plaintiff Mari Harper ("Harper") has filed an amended complaint that challenges the denial of disability benefits by Unum. As per the order of the Magistrate Judge, Harper has filed a motion for summary judgment limited to the issue of the appropriate standard of review in this case. Harper contends that review is *de novo* and Unum contends that review is abuse of discretion. For the reasons that follow, the Court finds that the appropriate standard of review is abuse of discretion and will deny Harper's motion.

**BACKGROUND**[1]

Harper was employed by Doctor's Medical Center, a subsidiary of Tenet Healthcare Corporation. In 2002, Tenet purchased a group policy of disability insurance ("the Plan") from Unum. Harper was covered by the Plan's policy of income replacement insurance, which included short term disability ("STD") benefits and long term disability ("LTD") benefits. The Plan provides in part: "When making a benefit determination under the policy, UNUM has the discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." UACL No. 174.

On May 26, 2002, Harper was involved in an automobile accident in which she was struck from behind and sustained serious bodily injury. On August 30, 2002, Harper submitted a claim for Plan benefits. See First Amended Complaint at ¶ 10; Unum's Memorandum at 7:21-22. It is agreed that Unum approved short term disability benefits up to October 17, 2002.[2]

On September 9, 2002, Unum sent a letter to Harper's attending physician, Dr. Hundal, that requested copies of medical records, consultations, reports, and treatment notes. See UACL 17. Unum received the medical records from Dr. Hundal on September 16, 2002. See id. On September 24, 2002, Nurse Palmer reviewed Harper's records for Unum. After summarizing the records, Palmer suggested that Harper be called to explain why she could not return to work, her treatment, her symptoms and her return to work plan. See Exhibit 2. Palmer also suggested that the specifics of Harper's work be determined and "would ask [attending physician] for specific R & L's and RTW plan."[3] Id. It appears that Unum then sent Dr. Hundal an additional form, the

---

[1] The Local Rules require that a party who moves for summary judgment to submit a separate statement of undisputed material facts. See Local Rule 56-260(a). Harper failed to do so and has therefore violated the Local Rules. The Court has considered striking the motion for summary judgment due to this failure. However, because Harper has specifically identified the evidence that she relies upon, her evidence is not particularly voluminous, there appears to be agreement by Unum as to most facts, summary judgment by Plaintiff on this issue was specifically ordered, and the Court does not feel it would benefit at this point from additional filings, the Court will not strike the motion. If any of these considerations were otherwise, the summary judgment motion would have been struck. The Court warns the parties to follow the filing requirements of the Local Rules in the future. The factual background is taken mostly from the Exhibits submitted by Harper. The same Exhibits, as well as other evidence, was submitted by Unum. References to "Exhibit" refer to Harper's evidence and references to "UACL No." refer to Unum's evidence.

[2] This date was identified by Harper's attending physician in the claims process. See *infra*.

[3] It appears that "R & L" means restrictions and limitations and "RTW" means "return to work."

Attending Physician's Statement form ("the APS form"), which was returned to Unum on September 30, 2002.  See Exhibits 1, 8; UACL 55.  Under the "restrictions" sections of the APS form, which parenthetically asked "What the patient should not do," Dr. Hundal responded, "Patient was/is advised to do anything she is able to do."  Id.  Under the "limitations" section, which parenthetically asked "What the patient cannot do," Dr. Hundal responded, "limited arm [and] neck movement.  Difficulty in retrieving objects from floor/ground.  Unable to sit or lie without pain.  Difficulty swallowing.  Light headedness."  Id.  Dr. Hundal also indicated that Harper would recover for purposes of her occupation and that employment could begin on October 17, 2002.  Id.

On October 9, 2002, Harper sent Unum additional information that included a list of things that she could not and should not do.  See Exhibit 3.  The list of things that Harper could not do was consistent with the limitations identified by Dr. Hundal in the APS but also included great difficulty in reaching above the shoulders, poor sleep patterns and necessary medication to sleep, and an inability to take a deep or normal breath without pain.  See id.

On November 11, 2002, following an appointment on November 8, 2002, Dr. Hundal signed a "certificate of excuse" for Harper that reads: "Please excuse this absence: 5-29-02 [to] 12-08-02."  Exhibit 4.

On November 13, 2002, Harper saw Dr. Elsakr for heartburn and swallowing difficulties.  Exhibit 12.  In the records for this visit, Dr. Elsakr noted that Harper had the heartburn symptoms (GERD) for over 10 years.  Id.  In January 2003 post-op notes, Dr. Elsakr noted that Harper was a "53 year old lady with diabetes, depression, and GERD for over 10 years . . . ."  Exhibit 13.

On November 22, 2002, Nurse Palmer again reviewed the claim file.  Exhibit 7.  After identifying symptoms and updated medical records, Nurse Palmer opined: "Based on available medical, it seems [claimant] does continue to [complain of] pain, however, there is no clear indication that [claimant] has had a decrease in function, or is limited by her symptoms, and [attending physician] has indicated that [claimant] has no specific restrictions.  Am unable to infer ongoing restrictions."  Id.

On January 31, 2003, Unum sent Harper a letter in response to Dr. Hundal's certificate of

excuse. Exhibit 5. Unum's letter stated that the certificate of excuse was not sufficient to justify benefits beyond October 16, 2002, and that if Harper could not return to work due to medical reasons, then the attending physician needed to provide certain information so that Unum could understand how Harper's medical condition continued to affect her ability to work. See id. Specifically, Unum requested: (1) all current medical records from October 1, 2002 onwards; (2) a list from the physician of activities that Harper cannot and should not do along with an explanation of the medical reasoning supporting the restrictions and limitations; (3) a copy of the treatment plan; (4) certain test results if those tests were administered; and (5) physical therapy progress notes if therapy was administered. Id. The letter also stated: "Make this letter available to your physician(s) and request that your physician(s) mail or fax this information to us. A note from your physician saying you cannot return to work will not be acceptable without the supporting medical data listed above. Benefits will not be considered beyond 10/16/02 unless we receive and review additional medical information." Id.

On February 27, 2003, Unum denied Harper's claim for disability benefits beyond October 17, 2002. Exhibit 8. The denial letter stated in part:

> [With respect to the APS] Since there seemed to be no restrictions (activities you should not do), only limitations (activities you cannot do), you did not return to work on 10/17/02, and Dr. Hundal indicates you had improved, we requested the treatment notes to better understand your condition and treatment and how either may have been precluding you from performing your occupation as a communications manager.
>
> The office visit notes dated 10/17/02 from Dr. Hundal indicates you reported having left sided chest wall pain, increased left sided rib cage pain that is worse with coughing. A note dated 11/11/02 from Dr. Hundal requested an excuse from work through 12/8/02. Although Dr. Hundal requested an excuse form work, there is no indication that you are restricted from any specific physical activity. The medical information does not provide a clear understanding of how your ability function was decreased. Since the noted limitations were based on you[r] own report of symptoms and no correlated findings, we cannot support disability beyond 10/16/02.
>
> If you have additional information to support your request for disability benefits, it must be sent to my attention for further review . . . within 180 days . . . .[4]

Id.

---

[4] The letter also informed Harper that she could appeal the decision. Exhibit 8.

On March 30, 2003, Harper appealed Unum's denial.  Exhibit 9.  In her appeal letter, Harper indicated that she had begun to experience amnesia that would last for several hours to a day.  Id.  Harper indicated that the first occurrence was in the fall and that amnesia would occur once every 7 to 10 days.  Id.  Additionally, Dr. Hundal's notes for October 2, 2002, indicate that Harper had depression and that medication for depression was begun.  Exhibit 11.

In May 2003, Unum sent the file to be reviewed by Dr. Higgins, who was a clinical neuropsychologist, Dr. Doane, and Dr. Lee.  On May 13, 2003, Dr. Doane had been asked if the medical information supported impairment beyond 10/17/02 and to identify restrictions and limitation which may be relevant to medical conditions.  See Exhibit 14.  In his report, Dr. Doane repeated what Dr. Hundal wrote in the APS form under the restrictions and limitations section.  Id.  As part of his report, Dr. Doane noted that Dr. Elsakr had indicated that Harper had GERD for 10 years.  Id.  Dr. Doane also noted that Dr. Hundal had noted depression by Harper on October 2, 2002, and had prescribed medication.  Id.  Dr. Doane ultimately concluded that that there was no evidence of impairment from any medical condition identified in the medical records and found no evidence of limitations from any general medical condition.  Id.  Dr. Doane also opined that the blunt trauma injuries and contusions would have stabilized about six weeks after the accident.  Id.  Similarly, on May 16, 2003, Dr. Higgins issued his report.  Exhibit 15.  Dr. Higgins had been asked whether the medical information supported psychiatric impairment beyond 10/17/02, whether Harper had been receiving or referred for psychiatric treatment "for handwritten medical records, unable to read," and whether Harper was receiving appropriate care and treatment for a psychiatric condition.  Id.  As part of his synopsis of the records, Dr. Higgins stated that Dr. Elsakr noted that Harper had been troubled by depression for over 10 years.  Id.  Dr. Higgins also noted that the medical records are limited and somewhat difficult to decipher and that depressive difficulties appear to be long-standing.  Id.  Dr. Higgins ultimately concluded that there was insufficient evidence of impairment beyond 10/17/02, that Harper had not been referred for psychiatric treatment, and that her level of care would not be appropriate for someone with a severe depressive disorder.  Id.  Similarly, Dr. Lee issued his report on May 28, 2003.  Dr. Lee was asked whether the medical information supported impairment from the

physical injuries received per the medical records, to describe restrictions and limitations, and whether Harper was receiving appropriate treatment. Exhibit 17. Dr. Lee summarized the records and also quoted Dr. Hundal's restrictions and limitations from the ASP. Id. Dr. Lee notes that some of Dr. Hundal's records are not decipherable but concluded that the records did not support a sufficiently severe impairment from an orthopedic condition after 10/17/02, that the usual time frame for healing of Harper's orthopedic injuries was six to eight weeks, and that it appeared that Harper received appropriated orthopedic care. Id.

On June 9, 2003, Unum denied Harper's appeal. Exhibit 16. The denial letter summarized Drs. Doane, Lee and Higgins's respective conclusions. Id. The letter also repeated Dr. Higgins's characterization of Dr. Elsakr's records that Harper had suffered from depression for over 10 years. Id. The letter stated that the depression would rise to the level of occupational employment. Id. The letter concluded that "the objective medical data does not support your subjective medical complaints. We are unable to support any restrictions and limitations precluding your work activity beyond 10/17/02."[5] Id.

On July 3, 2003, Harper saw Dr. Jones, a psychiatrist. Exhibit 19. Dr. Jones believed that Harper had developed a psychotic disorder secondary to cerebral concussion. Id. Dr. Jones's psychiatric evaluation indicated that Harper related that she had hallucinations (including arms coming out of her computer and feet sticking out from her bed) which caused her significant fear. Id. The evaluation also indicates that Harper would sometimes go to her daughter's home out of fear, that her granddaughter was afraid to be around her, she does not like to speak to people over the telephone, and that she cannot stand to have people look at her. Id. Jones indicated that there was no history of mental illness and that Harper's affect was tearfulness and depression. Id.

Also on July 3, 2003, one of Unum's adjuster's returned a telephone call to Harper. Exhibit 20. The adjuster said that Harper answered the phone crying, was very upset, and spoke in a low tone. Id. The adjuster discovered that Harper was to see Dr. Jones, and then called Dr.

---

[5] The letter also noted that there had been no referrals to a neurologist, orthopedist, or pain manager.

Jones's office to advise him of the conversation with Harper.  Id.; Exhibit 21.

On July 8, 2003, Harper re-appealed and requested review for income replacement benefits.  Exhibit 18.  The appeal notes that her physical injuries have greatly improved, but that she had some residual pain.  Id.

On September 22, 2003, Unum had Dr. Zimmerman, a clinical neuropsychologist, review Harper's file.  Exhibit 23.  Dr. Zimmerman was asked whether the new medical information from Dr. Jones, combined with prior medical information, support psychiatric impairment beyond 10/17/02 and also to provide restrictions and limitations from a psychiatric standpoint.  Id.  Dr. Zimmerman characterized Dr. Elsakr's records as indicating that Harper had depression for over 10 years.  Id.  Dr. Zimmerman also indicated that the symptoms reported to Dr. Jones were inconsistent with her prior reports to medical providers.  Id.  Dr. Zimmerman opined that Harper was:

> . . . reportedly depressed in response to residual pain from the [car crash] as of 10/2/02.  However, there is no evidence of serious psychiatric symptomatology that would be considered impairing in the documentation from 10/2/02 through 4/28/03.  The indication of inconsistency and exaggeration of complaints first presented on 5/29/03 prevents an accurate understanding of the claimant's psychiatric status.

Id.  Dr. Zimmerman concluded that the information did not support psychiatric impairment beyond 10/17/02 and that there were no restrictions or limitations.  Id.

On September 25, 2003, Unum again denied Harper's appeal.  Exhibit 22.  The denial letter stated that Dr. Elsakr's records indicated that Harper had been suffering from depression for 10 years.  Id.  The letter concluded that there was "no evidence of a serious psychiatric symptomatology that would be considered impairing in the documentation from 10/2/02 through 04/28/03.  It is our Medical Department's opinion that that the medical records did not substantiate a level of impairment beyond 10/17/02 that would preclude you from performing the duties of your occupation . . . ."  Id.  The letter also indicated that Harper had told Dr. Hundal that she had lost her job in November 2002, and therefore, under the provisions of the policy, coverage ceased when her job was terminated.  Id.  Finally, the letter indicated that the denial was Unum's final decision and that all administrative remedies had been exhausted.  Id.

1    In March 2004, Harper contacted Unum and informed them that the September 25, 2003,
2 denial letter was inaccurate.  Exhibit 24.  Specifically, Harper told Unum that the reference to Dr.
3 Elsakr reporting a 10 year history of depression was inaccurate.  Id.
4    This lawsuit followed.

## LEGAL STANDARDS

*Summary Judgment*

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).   In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004).  "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).

*ERISA Standard of Review*

A district court reviews a challenge to a denial of an ERISA plan's benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Opeta v. Northwest Airlines Pension Plan, 484 F.3d 1211, 1216 (9th Cir. 2007).  The default standard of review in ERISA cases is *de novo* and abuse of discretion review is utilized only if discretionary authority is "unambiguously retained" by the ERISA plan.  See Opeta, 484 F.3d at 1216; Feibusch v. Integrated Device Tech., Inc., 463 F.3d

8

880, 884 (9th Cir. 2006). "ERISA plans are insufficient to confer discretionary authority on the administrator when they do not grant any power to construe the terms of the plan." Opeta, 484 F.3d at 1216; Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 964 (9th Cir. 2006). ERISA plans that only state that the carrier is solely responsible for providing benefits, deciding all claims, and controlling the operation and administration of the plan do not provide for discretionary authority because such "provisions merely identif[y] the plan administrator's tasks, but bestow[] no power to interpret the plan." Opeta, 484 F.3d at 1216; Abatie, 458 F.3d at 964. When an abuse of discretion standard is applied, the court's review is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." Abatie, 458 F.3d at 967.

Nevertheless, even if an ERISA plan unambiguously retains discretion, a *de novo* review may still be appropriate in some circumstances. See Abatie, 458 F.3d at 971-72 (discussing Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984)). When a plan administrator does not actually exercise discretion, review of a denial is *de novo*. See Abatie, 458 F.3d at 972; Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1105-06 (9th Cir. 2003). Further, when an "administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well," review of a denial will be *de novo*. Abatie, 458 F.3d at 971. Such substantial and flagrant procedural violations by an administrator will "fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised discretion that ERISA and the ERISA plan grant. . . ." Id. However, it is the general rule that a procedural irregularity or violation in the processing if an ERISA claim "does not usually justify *de novo* review." Abatie, 458 F.3d at 972; Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005). In the "ordinary situation in which a plan administrator has exercised discretion but, in doing so, has made procedural errors," the review will be abuse of discretion; it is only in the "rare class of cases" that procedural irregularities will require *de novo* review. Abatie, 458 F.3d at 972.

**PLAINTIFF'S MOTION**

*Harper's Argument*

Harper argues that the appropriate standard of review is *de novo*. The record shows that Unum flagrantly violated 29 U.S.C. § 133(2) because it failed to provide Harper with a "full and fair review" of her claim. Harper argues that there was no full and fair review because Unum did not have contact with Harper's medical providers to clear up ambiguities in the record and then used those ambiguities to deny her claim. As part of the initial claims review, Harper's treating physician filled out a form in an ambiguous manner when he wrote under the "restrictions" section of the form: "patient was/is advised to do anything she is able to do." Nurse Palmer reviewed the claim, opined that the Dr. Hundal's record contained not "clear indication" of "specific restrictions," concluded that there were no basis to infer disability, but nevertheless suggested clarification from Dr. Hundal about restrictions and limitations for Harper; Unum never did so. To suggest a lack of specific information, suggest getting clarification, but then deny the claim without asking the treating physician to clear up ambiguous information is not a "full and fair review."

Also, Dr. Hundal provided a note that indicated Harper was sufficiently impaired that she should be excused from work from May through December 2002. However, Unum ignored this note and did not contact Dr. Hundal.

Further, during the administrative appeals process, Unum had a non-physician, Dr. Higgins, review medical records with respect to Harper's psychological symptoms. Dr. Higgins indicated that the records showed that Harper had suffered from depression for 10 years, even though the records actually indicated recent depression and that the 10 year figure referred to a heartburn condition. Unum relied on Dr. Higgins's recommendation to deny and continue to deny coverage, even though a separate opinion from Dr. Doane contradicted Dr. Higgins's report. Despite the disagreement, no attempts at clarification were made by Unum. Dr. Higgins's report was also used to refute a psychiatric diagnosis by Harper's psychiatrist.

Further, in the final denial letter, Unum made misstatements. The letter incorrectly indicates that medical records do not mention depression prior to October 17, 2002, and that Harper had depression for the last 10 years.

1    Finally, Unum provided Harper with only 138 pages of the 492 page claim file. Unum's
2 intentional deception prevented a full and fair review and amounts to a failure to exercise
3 discretion.

*Unum's Opposition*

5    Unum replies that it did not commit wholesale and flagrant violations of ERISA. Instead,
6 it reviewed all information on several occasions, did not have the same individuals or
7 subordinates review the file, and even allowed a second appeal even though it was under no
8 obligation to do so. Harper misconstrues and misstates the record in her assertions. Among
9 other things, Nurse Palmer's recommendations were not ignored and information from Dr.
10 Hundal was received. Nurse Palmer's first review pre-dated Dr. Hundal's ASP. Unum gave
11 Harper a full and fair review and was not deceptive.

*Discussion*

13    As an initial matter, the parties agree, and the language of the policy makes abundantly
14 clear, that the ERISA administrator retains discretion to determine eligibility and interpret
15 provisions of the Plan. See UACL No. 174. Thus, the Plan's language indicates that the
16 standard of review is abuse of discretion. See Abatie, 458 F.3d at 964.
17    To avoid the repercussions of the Plan's language, Harper argues that Unum engaged in
18 wholesale and flagrant violations of ERISA rules, specifically that she did not get a full and fair
19 review, such that Unum never really exercised discretion. The Court cannot agree with Harper.
20    A critical premise of Harper's motion is that Nurse Palmer's first evaluation on
21 September 24, 2002, included a review of Dr. Hundal's APS form. Harper assumes that Nurse
22 Palmer's notation that restrictions and limitations were not clear was in reference to Dr. Hundal's
23 responses on the APS form. However, that assumption is not valid. Nurse Palmer's report is
24 dated September 24, 2002. See Exhibit 2. Dr. Hundal's APS form was faxed to Unum on
25 September 30, 2002, at 11:30. See Exhibit 1; Exhibit 8. Nurse Palmer could not have reviewed
26 Dr. Hundal's APS form on September 24, 2002. The ambiguity to which Nurse Palmer refers is
27 the medical records, which were received on September 16, 2002, see UACL Nos. 17-45, not Dr.
28 Hundal's answers on the APS form. In fact, Nurse Palmer's second review (November 22, 2002)

11

stated that Dr. Hundal indicated no restrictions, and Nurse Palmer did not request further specification. See Exhibit 7. Harper's argument that Unum ignored Nurse Palmer's assessment and relied on a noted ambiguity in Dr. Hundal's APS form to deny the claim is not persuasive.

Further, prior to denying the claim for benefits post-October 17, 2002, Unum received the November 11, 2002, certificate of excuse signed by Dr. Hundal. The certificate provides no detail or medical rationale and does not expressly state or certify that Harper "was continuously disabled from May 29, 2002, up until December 8, 2002." Cf. Exhibit 4 with Harper Memorandum at 6:20-22. Unum expressly stated that the certificate of excuse was insufficient and that it needed additional records and specific medical rationale to justify benefits post-October 17, 2002. See Exhibit 5. In fact, Unum's letter of January 31, 2003, is rather detailed and tells Harper to present the letter to Dr. Hundal. See id. This is not flagrant or disingenuous conduct that prevented a full and fair review of Harper's claim.

With respect to Dr. Higgins, Harper argues that it was inappropriate to have a non-physician review her claim. However, Dr. Higgins was a neuropsychologist and Unum only asked Higgins to review the psychological/psychiatric aspects of Harper's case. Harper has not adequately explained why having Dr. Higgins review the file in his capacity as neuropsychologist was inappropriate.[6] This is an insufficient basis to change the standard of review.

With respect to Dr. Higgins's interpretation of Dr. Elsakr's records to include Harper having depression for 10 years, it appears that this may well be inaccurate and Dr. Zimmerman made the same misinterpretation. The portion of Dr. Elsakr's record that forms the basis for this interpretation read that Harper was a "53 year old lady with diabetes, depression, and GERD for over 10 years and with intermittent dysphagia to solid food, as well as liquid." Exhibit 13. Although other records do not so indicate, the Court cannot say that interpreting this sentence to mean that Harper had diabetes, depression, and GERD, each for 10 years, is wholly unreasonable or disingenuous. While a misinterpretation of medical records will be weighed and considered in an abuse of discretion standard, this misinterpretation is not so severe as to warrant a change in

---

[6]The same is true of Dr. Zimmerman, who is also a neuropsychologist.

the standard of review.

As for the alleged conflict between Dr. Higgins and Dr. Doane, Dr. Higgins was asked to review the file for psychological issues. Dr. Doane was asked to review the file for physical issues. Both doctors concluded that Harper's symptoms were not sufficiently severe to justify a finding of impairment. Given the separate areas in which reviews were sought and the separate conclusions of the doctors for different aspects of the claim, the failure by Unum to clear up any tensions between Dr. Doane's report and Dr. Higgins's report is not sufficiently severe or flagrant to change the standard of review.

With respect to alleged misrepresentations in the letter of September 25, 2003, the Court has already addressed the issue concerning the "10 year history of depression." The other misrepresentation identified by Harper, that there was "no mention in Dr. Hundal's notes of depression prior to or on October 17, 2002," see Harper Memorandum at 9:28-10:3, does not appear to be a misrepresentation. The portion of the denial letter marked by Harper and on which Harper appears to rely for her assertion reads: "However, there was no reference to any *depressive symptoms* on your follow-up visit on 10/17/02 with Dr. Hundal. With the exception of the report that your depression was better with Celexa on 11/8/02, there were no further references to *depressive symptoms* until 4/28/03 (or eleven months post injury) when you were reportedly more depressed with symptoms considered secondary to pain." Exhibit 22 (emphasis added). The letter does not deny that Harper was on Celexa or being treated for depression, instead, the letter focuses on the symptomatology in the records. Nevertheless, assuming that there is a misrepresentation, it is not sufficiently severe or flagrant to change the standard of review. Of course, any inaccuracies or misrepresentations will be considered by the Court as part of the abuse of discretion standard.

As for directly providing Harper 138 pages of the claim file yet producing 492 pages through discovery in this case, ERISA regulations that mandate the provision of relevant claim file documents to a claimant are in the context of appealing an adverse decision. See 29 C.F.R. § 2560.501-1(h), (j). In the first denial letter dated February 27, 2003, Unum informed Harper of her right to appeal, that she would have access to all relevant documents, and that if the appeal

was denied, she could receive all relevant documents upon request and free of charge. See Exhibit 8.  The second denial letter dated June 9, 2003, informed Harper that she was entitled to all relevant documents free of charge upon request.  See Exhibit 16.  The last denial letter was dated September 25, 2003, and stated that no further reviews were available.  See Exhibit 22.  Harper requested the claim file in March 2004, approximately 6 months after Unum's final determination.  See Exhibit 24; Harper's Memorandum at 10:17-22.  The parties have not briefed the issue, so it is unclear if Unum violated ERISA.[7]  However, assuming that there has been a violation, the Court is aware of no harm suffered by Harper.  No further appeals were available to Harper and Harper was able to file this lawsuit.  Further, it is apparent that significant review of Harper's claim took place.  An original claim and two appeals took place, five health care professionals reviewed the file, Unum explained the reasons for denial, and Unum told Harper what information it was looking for and gave her the opportunity to present the information.  If Unum did not actually provide all relevant documents after its final determination, given the conduct leading up to this failure and no discernable harm suffered by Harper, changing the standard of review is not appropriate.

The grounds urged by Harper to change the standard of review to *de novo*, whether viewed individually or collectively, are insufficient.  Harper has not adequately shown wholesale and flagrant violations by Unum.  As specifically argued, Harper has not shown that she was denied a full and fair review of her claim as required by 29 U.S.C. § 1133(2).  It is a "rare class of cases" where procedural irregularities will change the standard of review from *de novo* to abuse of discretion.  Abatie, 458 F.3d at 972.  This case is not one of those rare cases, instead, it is part of the ordinary class of cases were some procedural irregularity may have occurred in the course of exercising of discretion.  See id.; Patrick v. Hewlett-Packard Co. Emple. Benefits Org. Income Prot. Plan, 2007 U.S. Dist. LEXIS 66260, *20-*22 (N.D. Cal. 2007).  The standard of review will be abuse of discretion.  However, in applying the abuse of discretion standard, the Court will be informed by and weigh any conflict of interest that Unum may have in this case.

---

[7]Further, there is no description of the documents that were provided to Harper.

See Abatie, 458 F.3d at 968-69.  Additionally, like conflicts of interest, any procedural irregularities will be "weighed in deciding whether an administrator's decision was an abuse of discretion." Id.

**CONCLUSION**

As the parties agree, the plain and unambiguous language of the Plan calls for an abuse of discretion analysis.  The possible procedural irregularities identified by Harper do not show flagrant and wholesale violations of ERISA nor do they demonstrate that Unum failed to exercise discretion.  Thus, this case will be reviewed under the abuse of discretion standard, which includes, *inter alia*, consideration of any conflicts of interest by Unum and any procedural irregularities committed by Unum.

Accordingly, IT IS HERE BY ORDERED that Harper's motion for summary adjudication is DENIED and the standard of review for case this will be abuse of discretion.

IT IS SO ORDERED.

**Dated:   October 23, 2007**            /s/ Anthony W. Ishii
                                        UNITED STATES DISTRICT JUDGE