1
2
3
4
5                **IN THE UNITED STATES DISTRICT COURT FOR THE**
6                       **EASTERN DISTRICT OF CALIFORNIA**
7
8    **MARI HARPER,**                    )      **CIV F 06-893 AWI DLB**
                                         )
9             **Plaintiff,**             )      **FINDINGS OF FACT AND**
                                         )      **CONCLUSIONS OF LAW**
10      **v.**                           )
                                         )      **ORDER DIRECTING THE**
11   **UNUM LIFE INSURANCE COMPANY**     )      **CLERK TO ENTER**
     **OF AMERICA,**                     )      **JUDGMENT AND CLOSE THE**
12                                       )      **CASE**
              **Defendant.**            )
13                                       )
                                         )
14   _____)
15   _____
16
17          This is an Employee Retirement Insurance Security Act ("ERISA"), 29 U.S.C. § 1001 et.

18   seq., case that was removed from state court by Defendant UNUM Life Insurance Company of

19   America ("Unum").  Plaintiff Mari Harper ("Harper") has filed an amended complaint that

20   challenges the denial of disability benefits by Unum.  In a previous motion, this Court

21   determined that the proper standard of review is abuse of discretion.  See Court's Docket Doc.

22   No. 34.  After listening to the arguments of the parties during a bench trial, and having reviewed

23   the record and the parties' submissions, the Court concludes that Unum did not abuse its

24   discretion in denying benefits to Harper.  In support of this conclusion, the Court issues the

25   following findings of fact and conclusions of law in accordance with Rule of Civil Procedure 52.

26
27
28

## FINDINGS OF FACT[1]

1.    In May 2002, Plaintiff Mari Harper ("Harper") had been employed with Doctors Medical Center of Modesto (a Tenet Healthcare Corporation subsidiary) for over 26 years; her job title as of May 2002 was "Communications Manager."  UACL 2, 4.

2.    Tenet had created a group disability plan ("the Plan") for its eligible employees; the Plan was wholly insured by both short term disability ("STD") and long term disability ("LTD") insurance policies issued by Unum.  See UACL 163-196; PUMF Nos. 5, 7; DRPFF Nos. 5-7; DFF No. 2.

3.    The STD policy of the Plan provides in relevant part:

> ***HOW DOES UNUM DEFINE DISABILITY?***
>
> You are disabled when Unum determines that:
> -you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury, and
> -you have a 20% or more loss in weekly earnings due to the same sickness or injury.
>
> **LIMITED** means what you cannot or are unable to do.
>
> **MATERIAL AND SUBSTANTIAL DUTIES** means duties that:
>
> -are normally required for the performance of your regular occupation; and
> -cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, UNUM will consider you able to perform that work requirement if you are working or have the capacity to work 40 hours per week.

---

[1]"PFF" refers to Plaintiff's proposed findings of fact, "DFF" refers to Defendant's proposed findings of fact, and "DRPFF" refers to Defendant's response to Plaintiff's proposed findings of fact.  Plaintiff did not file a response or objections to Defendant's proposed findings of fact.  The administrative records have "Bates stamp" type numbers that are prefaced with "UACL."  The Court will base its findings of fact on either UACL's, PFF's, DFF"s or DRPFF's.

***HOW LONG WILL UNUM CONTINUE TO SEND YOU PAYMENTS?***

<u>Group 1, Group 3</u>
Unum will send you a payment each week up to the **maximum period of payment**. Your **maximum period of payment** is 120 days during a continuous period of disability.

**MAXIMUM PERIOD OF PAYMENT** means the longest period of time Unum will make payments to you for any one period of disability.

***WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?***

Your proof of claim, provided at your expense, must show:
-that you are under the regular care of a physician;
-the appropriate documentation of your weekly earnings;
-the date your disability began;
-the cause of your disability;
-the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
-the name and address of any hospital or institution where you received treatment, including all attending physicians.

**". . . WHEN WILL PAYMENTS STOP?**

We will stop sending you payments and your claim will end on the earliest of the following:
–   when you are able to work in your regular occupation on a part-time basis but you choose not to;
–   the end of the maximum period of payment;
–   the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
–   the date you fail to cooperate or participate in Unum's Rehabilitation and Return to Work Assistance program;
–   the date you fail to submit proof of continuing disability;
–   after 12 months of payments if you are considered to reside outside the United States or Canada.  You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months or benefits;
–   the date your disability earnings exceed the amount allowable under the plan . . ."

**WHEN DOES YOUR COVERAGE END?**

Your coverage under the policy or plan ends the earliest of:

– the date the policy or plan is cancelled;
– the date you no longer are in a eligible group
– the date your eligible group is no longer covered;
– the last day of the period for which you made any required contributions; or
– the last day you are in active employment except as provided under the covered leave of absence provision.

DFF No. 2; UACL 169-194.

4.   Harper was born on October 5, 1949.  UACL 3.

5.   On May 26, 2002, Harper was involved in a rear impact auto accident ("the Accident").   UACL 59-74.

6.   Harper's vehicle was lifted up in the collision and came to rest on the hood of the vehicle that had rear-ended her.  UACL 73.

7.   Harper was taken by ambulance to a hospital emergency room.  PFF No. 11; UACL 63, 71.

8.   At the emergency room, Harper was examined, underwent extensive testing, was treated and released for follow up care by her personal physician, Dr. Talminder Hundal who is a family medicine practitioner.  See PFF Nos. 13-14; DFF Nos. 5-6.

9.   As part of the testing and treatment at the emergency room, Harper underwent a CAT scan of her brain, which demonstrated normal noncontrast computed tomography and a right frontal scalp injury; Harper was not diagnosed with any type of concussion syndrome as a result of the CAT scan.  See UACL 34.

9.   Harper saw Dr. Hundal on May 29, 2002, where she complained of headaches, neck pain, low back pain with numbness and tingling, and left sided chest pain that was worse with deep breath and cough.  PFF Nos. 15-16; UACL 31.

10.  Harper continued to receive treatment from Dr. Hundal at all relevant times from May 29, 2002, forward.  See PFF No. 18.

11.  On August 30, 2002, Harper submitted a claim for STD benefits under the Plan as a result of injuries sustained in the Accident.  See DFF No. 4; PFF No. 22.

12. On September 9, 2002, Unum sent a letter to Harper's attending physician, Dr. Hundal, that requested copies of all medical records in his possession dated May 1, 2002 to present, including consultations, reports, treatment notes, and test results; Unum received the records from Dr. Hundal on September 16, 2002.  See UACL 17; DFF No. 9; PFF No. 23.

13. On September 24, 2002, Nurse Mary Palmer reviewed the medical records for Unum.  DFF. No. 11; PFF No. 25.

14. After summarizing the medical records, Palmer explained *inter alia* that Harper sustained cervical and lumbar strain/sprain injury, chest contusion and multiple abrasions.  Palmer noted that Dr. Hundal's records indicate ongoing tenderness, but it was unclear how this impacted Harper's functional capacity.  Palmer suggested that Harper be called to explain why she could not return to work, her treatment, her symptoms and her return to work plan.  Palmer also suggested that the specifics of plaintiff's occupation be determined and "would ask AP [attending physician] for specific R&Ls [restrictions and limitations] and RTW [return to work] plan."  Palmer also suggested obtaining the "MVA (motor vehicle accident) report," the "ED (emergency department) report," and an "OA (occupational analysis?) so the specifics of her occupation are known."  UACL 50.

15. On September 27, 2002, UNUM spoke to Harper who advised she could perform her normal activities of daily living, but that she has a hard time making the bed, can't sleep, and has a hard time with anything that involves reaching and bending.  Harper also stated during the phone call that Dr. Hundal had not provided her with any restrictions and limitations as he wanted her "to do everything she can possibly do. . . or at least try."  UACL 423.

16. Unum's notes of the September 27 telephone call also state that Harper "is a 'Communications Manager,' what exactly are the occupational duties?"  UACL 423.

17. Unum provided Harper with an Attending Physician's Statement ("APS"), which was completed by Dr. Hundal and received by Unum on September 30, 2002.  UACL 55, 411.

18. Under the "restrictions" section of the APS form, which parenthetically asked "What the patient should not do," Dr. Hundal responded, "Patient was/is advised to do anything she is able to do."  Under the "limitations" section, which parenthetically asked "What the patient

cannot do," Dr. Hundal responded, "limited arm [and] neck movement. Difficulty in retrieving objects from floor/ground. Unable to sit or lie without pain. Difficulty swallowing. Light headedness." Under the "prognosis for recovery" section, Dr. Hundal responded, "Physical therapy will improve arm and neck movement. Patient will see G.I. for difficulty in swallowing (dysphagia). Pain in side (bruise of lung/rib) will/should be healed with time." UACL 55.

19. Dr. Hundal also indicated that Harper would recover for purposes of her occupation and that employment could begin on October 17, 2002. UACL 55.

20. On October 9, 2002, plaintiff sent a letter to UNUM, which was received on October 14, 2002 and provided in part:

> I currently have some limitations of movement of my neck, left shoulder, and left arm. I have great difficulty in reaching above my shoulders. I have great difficulty in retrieving objects from the floor/ground. I am unable to sit or lie without pain in my side. I can only sleep with medication, and then only two to three hours at a time before I must get up and walk. I am unable to take a normal or deep breath without pain. I have difficulty swallowing.

> UACL No. 57.

21. Harper's October 9 letter does not mention that she was depressed, that she suffered from significant episodes of amnesia in which she lost full days of her life, or that she does not sleep for days at a time but then will sleep for 18 to 24 hours straight. UACL 57.

22. By letter dated October 21, 2002, Unum informed Harper that she had been approved for benefits through October 16, 2002, and that if she could not return to work on October 17, 2002, then additional information was required from her healthcare providers, i.e. current medical records, a list of things that she cannot and should not do and a medical explanation for the restrictions, a treatment and return to work plan, the results of particular tests if administered, and the results of physical therapy if attending. UACL 427-428.

23. On November 11, 2002, Dr. Hundal signed and faxed a "certificate of excuse" for Harper that reads in its entirety: "Please excuse this absence: 5-29-02 [to] 12-08-02." UACL 78.

25. On November 11, 2002, Dr. Hundal also submitted additional medical records (four pages) to Unum. See UACL 77-81.

26. Dr. Hundal's notes for October 2, 2002, indicate *inter alia* that Harper had unchanged left sided rib cage pain, her neck and low back pain was better with physical therapy, and that she had depression (apparently in light of symptoms of sadness, crying "a lot," low self-esteem, inability to relax, and inability to sleep well).  Celexa for depression and Ambien for sleep were prescribed.  UACL 81.

27. Dr. Hundal's notes for October 17, 2002, indicate that Harper's neck and back pain were much improved, but that the left side rib cage pain was unchanged and worse with coughing or sneezing.  It appears that "PT" or physical therapy is to continue.  It does not appear that Harper's ability to return to work was discussed or addressed at this visit, nor does it appear that Harper made complaints about depression or amnesia.  UACL 79.

28. Dr. Hundal's notes from November 8, 2002 indicate: "Left sided chest wall secondary rib fracture pain increase with cough and deep breath . . . when lying down still cannot lie on left side.  Neck low back pain decrease.  No headache for two weeks still have numbness in arm.  Depression better with celexa.  Lost her job. . . . bilateral paravertebral muscle strain. . . . Depression."  UACL 80.

29. Additionally, although not part of the records submitted to Unum on November 11, on November 13, 2002, Harper was examined by Dr. Elsakr for heartburn and swallowing difficulties, i.e. her GERD (gastroesophageal reflux disease).  UACL 89-91.

30. On November 18, 2002, Nurse Palmer was asked whether the medical notes from October 17 and November 8, 2002, supported a finding of impairment beyond October 18, 2002.  UACL 83.

31. On November 22, 2002, Nurse Palmer replied that she reviewed Harper's medical records, referenced her (Palmer's) prior review, noted that "updated medical includes" office visits for October 17 and November 8, noted the "Hall Pass" of November 11 from Dr. Hundal, and ultimately opined "Based on available medical, it seems [claimant] does continue to [complain of] pain, however, there is no clear indication that [claimant] has had a decrease in function, or is limited by her symptoms, and [the attending physician] had indicated that [claimant] has no specific restrictions.  Am unable to infer ongoing restrictions."  UACL 85.

32. On January 29, 2003, Harper contacted Unum to check on the status of her claim and to advise that she had not yet returned to work.  UACL 432-433.

33. There is no indication that Unum had contacted or corresponded with Harper between at least November 11, 2002, through January 29, 2003.  UACL 393.

34. On January 31, 2003, Unum employee Glen Picard returned Harper's call and discussed the status of her claim.  UACL 433.

35. Picard advised Harper to provide specific restrictions and limitations and physical therapy notes.  UACL 433.

36. Also on January 31, 2003, Picard sent Harper a letter that denied any benefits beyond October 16, 2002.  UACL 434-435.

37. Unum's letter stated that the certificate of excuse was not sufficient to justify benefits beyond October 16, 2002, and that if Harper could not return to work due to medical reasons, then the attending physician needed to provide certain information so that Unum could understand how Harper's medical condition continued to affect her ability to work. UACL 434-435.

38. Specifically, Unum requested: (1) all current medical records from October 1, 2002 onwards; (2) a list from the physician of activities that Harper cannot and should not do along with an explanation of the medical reasoning supporting the restrictions and limitations; (3) a copy of the treatment plan; (4) certain test results if those tests were administered; and (5) physical therapy progress notes if therapy was administered.  The letter also stated: "Make this letter available to your physician(s) and request that your physician(s) mail or fax this information to us.  A note from your physician saying you cannot return to work will not be acceptable without the supporting medical data listed above.  Benefits will not be considered beyond 10/16/02 unless we receive and review additional medical information."  UACL 434.

39. On February 17, 2003, Unum received from Dr. Hundal copies of all notes from medical exams/appointments dated November 8, 2002, to February 10, 2003, three pages of treatment notes from Dr. Elsakr that were unrelated to the Accident, and a copy of Unum's January 31, 2003, denial letter.  UACL 87-95.

40. The February 17, 2003, transmission from Dr. Hundal did not include responses to the specific requests made in the January 31, 2003, denial letter.  UACL 87-95.

41. Dr. Hundal's December 6, 2002, office visit note indicated that plaintiff's "neck and back pain better now."  Harper continued to complain of left sided chest wall pain and that it was also painful with a deep breath or cough.  Harper did not complain of any depressive symptoms (although it is noted that Harper was on Celexa), nor did she complain of significant episodes of amnesia in which she lost full days of her life.  UACL 94.

42. Dr. Hundal's January 8, 2003, office visit note indicated that plaintiff stated that chest pain had increased. Depression continued to be an ongoing diagnosis and Harper continued to take Celexa, however, Harper did not complain of any depressive symptoms, nor did she complain of significant episodes of amnesia in which she lost full days of her life.  UACL 93.

43. Dr. Hundal's February 10, 2003, office visit note indicated that Harper complained of localized chest pain.  As a result, Dr. Hundal ordered an EKG and chest x-ray.  Harper's neck and back pain were reported as better now.  Harper did not complain of any depressive symptoms, nor did she complain of significant episodes of amnesia in which she lost full days of her life.  UACL 92.

44. On February 18, 2003, Picard requested an additional medical review in order to determine whether restrictions and limitations could be inferred beyond October 16, 2002.  UACL 97.

45. On February 25, 2003, Nurse Mary S. Ryer reviewed Harper's file and updated medical records.  UACL 107.

46. On February 28, 2003, Nurse Ryer responded by referencing prior reviews and stating that the new information indicated that:  Harper had GERD for 10 years, dysphasia had improved, Harper visits Dr. Hundal monthly, Harper continues to report chest wall pain and low back minimal tenderness, that it appears that Harper suffered injuries consistent with "sprain, strain," there is no evidence of seeing a psychologist for depression but is managed by Dr. Hundal with Celexa, and that Harper reported in a phone call that it hurt to do activity.  UACL 107.

47. Nurse Ryer's impression included the following: "given the usual recovery for sprain strain, no evidence of uncontrolled diabetes, medical cannot infer restrictions beyond 10-16-02. MD gave no restrictions and encouraged [Harper] to do what she could do.  Limitations are based on self reported complaints of pain and self limiting versus test or exams evidencing a pathological basis for reported pain."  UACL 107.

48. In a letter authored by Picard and dated March 11, 2003, Unum denied Harper's claim for disability benefits beyond October 16, 2002.  UACL 440-443.

49. The March 11 denial letter stated in part:

> The [APS] completed by Dr. Hundal notes your prognosis for recovery of the arm and neck movement will improve with physical therapy . . . .  The form also indicates you had not reached maximum medical improvement and fundamental changes were expected in 1-2 months.  In addition, the [APS] indicates you had improved, employment could begin on 10/17/02, and you were ambulatory.  Although this form was not dated, we received it on 9/30/02 and it indicates the last office visit was on 9/23/02.  In accordance with Dr. Hundal's recommendations, we approved the duration of your disability for 20 weeks and 4 days from 5/26/02 through 10/16/02.  Since there seemed to be no restrictions (activities you should not do), only limitations (activities you cannot do), you did not return to work on 10/17/02, and Dr. Hundal indicates you had improved, we requested the treatment notes to better understand your condition and treatment and how either may have been precluding you from performing your occupation as a communications manager.
>
> The office visit notes dated 10/17/02 from Dr. Hundal indicates you reported having left sided chest wall pain, increased left sided rib cage pain that is worse with coughing.  A note dated 11/11/02 from Dr. Hundal requested an excuse from work through 12/8/02.  Although Dr. Hundal requested an excuse from work, there is no indication that you are restricted from any specific physical activity.  The medical information does not provide a clear understanding of how your ability to function was decreased.  Since the noted limitations were based on you[r] own report of symptoms and no correlated findings, we cannot support disability beyond 10/16/02.
>
> If you have additional information to support your request for disability benefits, it must be sent to my attention for further review . . . within 180 days . . . .[2]

UACL 441.

50. Picard's denial had been reviewed and approved by his supervisor.  UACL 444.

51. By letter dated March 30, 2003 (but received on April 8, 2003), Harper appealed Unum's denial.  UACL 118-119.

52. In her appeal letter, Harper described the status of the limitations that she had identified in

---

[2] The letter also informed Harper that she could appeal the decision.  Exhibit 8.

her October 2, 2002, letter: (1) her left shoulder and arm were back to normal, her neck has some pain when she turns it, she can reach above her shoulders with some pain to her left side, and she can pick up objects off of the floor with some difficulty; (2) she can sit or lie for up to an hour without pain in her side, she cannot sleep on her left side, she can sleep with medication and needs to get up every 2 to 3 hours to walk off pain, (3) normal breathing is no longer painful, but does have pain on deep breaths or sneezes, (4) she no longer has a swallowing problem, and (5) she has occasional shooting pain from her neck/jaw to her ears. UACL 118.

53. Harper also indicated that she had begun to experience amnesia that would last for several hours to a day, the first occurrence was in the fall, and that amnesia would occur once every 7 to 10 days.  UACL 119.

54. Harper also stated that she would contact Dr. Hundal "and ask him to support" the statements made in the March 30, 2003, appeal letter.  UACL 119.

55. No evidence in the record indicates that Dr. Hundal ever supported or confirmed the assertions made by Harper in her March 30, 2003, letter.

56. Unum assigned Shelly Kerry to Harper's appeal, and on April 29, 2003, Kerry prepared a synopsis and sent Harper's records for a psychiatric, general medical, and orthopedic review.[3]  UACL 122-123.

57. Also on April 29, 2003, Unum placed a call with Perot Systems "to verify coverage STD/LTD."  UACL 393.

58. Unum spoke with personnel from Dr. Hundal's office on May 2, 2003, who informed Unum that Dr. Hundal's records beginning in November 2002 would be sent to Unum, but that Dr. Hundal would not write a letter of appeal as requested by Harper.  UACL 456.

59. On May 13, 2003, Dr. Doane had been asked (1) if the medical information supported impairment beyond 10/17/02 and (2) to identify restrictions and limitation which may be relevant to medical conditions.  UACL 127-128.

---

[3]Shelly Kerry's review included a description of the motor vehicle accident

60. In his report, Dr. Doane gave a brief description of the automobile accident[4] and repeated what Dr. Hundal wrote in the APS form under the restrictions and limitations section. As part of his report, Dr. Doane noted that Dr. Elsakr had indicated that Harper had GERD for 10 years. Dr. Doane also noted that Dr. Hundal had noted depression by Harper on October 2, 2002, and had prescribed medication. Dr. Doane noted that there was no job description on file. UACL 127-128.

61. Dr. Doane ultimately concluded as follows:

> I do not find evidence of impairment from any medical conditions identified in the medical records. Specifically, the clinical records do not record evidence of ketoacidosis, hypoglycemia or end organ failure such as vascular disease, renal disease, retinopathies or neuropathies that would indicate potential impaired functional capacity from diabetes. GERD is not an impairing condition in the absence of severe erosive esophagitis or cancerous changes. There is no evidence of such complications. There were no other general medical conditions identified that would impact functional capacity. Contusions and abrasions, including lung and liver, would have resolved long before 10/17/02. Chest wall blunt trauma, including fractured ribs, bone contusions and cartilaginous injuries would have stabilized to the point of resumption of heavy manual work by six weeks post trauma. That is not to say some level of discomfort would not be present after six weeks and for several months thereafter, but impairment for full functional activity would not be supported. I do not find evidence of limitations from any general medical condition. Consequently, I do not find any condition that would require restrictions.

> UACL 128.

62. Dr. Doane did not review the two letters submitted by Harper, dated October 9, 2002, and March 30, 2003. UACL 127-128.

63. On May 16, 2003, Dr. Higgins, a neuropsychologist, issued a psychological report on Harper's records. UACL 133-134.

64. Dr. Higgins had been asked (1) whether the medical information supported psychiatric impairment beyond 10/17/02, (2) whether Harper had been receiving or referred for psychiatric treatment "for handwritten medical records, unable to read," and (3) whether Harper was receiving appropriate care and treatment for a psychiatric condition. UACL 133.

---

[4]Dr. Doane notes that Harper was involved in a multi-vehicle accident in which her vehicle was sandwiched between 2 other vehicles in a line of traffic when the vehicle behind her was unable to stop. See UACL 127. Dr. Doane then notes that Harper sustained chest wall contusion, probable lung and liver contusions, as well as facial, rib, head, knee and upper extremity contusions. See id.

65. Dr. Higgins reviewed records from Drs. Hundal and Elsakr, which he characterized as somewhat limited and difficult to read, and it does not appear that he reviewed Harper's March 30, 2003, letter.  UACL 133-134.

66. As part of his synopsis of the records, Dr. Higgins stated that Dr. Elsakr noted that Harper had been troubled by depression for over 10 years and that depressive difficulties appear to be long-standing.  UACL 133-134.

67. Dr. Higgins saw "no evidence to support the view that [Harper's symptoms] would rise to the level of occupational impairment," and answered the three specific questions as follows:

> I see no medical information that would support psychiatric impairment beyond 10/17/2002 and I see no evidence that Ms. Harper has received or been referred to specialty psychiatric treatment.  Her level of care would not be appropriate for a severe depressive disorder.  Such treatment would include psychiatric treatment on a regular basis by a psychiatric provider, preferably supplemented by  weekly to biweekly psychotherapy.  As previously noted, I see no evidence of any such treatment or any referral for such treatment.

> UACL 134.

68. On May 19, 2003, after both Doane and Higgins presented their opinions, Harper provided another authorization, a recent x-ray report and Dr. Hundal's office notes from 10/17/02 through 4/28/03.  UACL 136-148.

69. The x-ray report of Harper's chest, dated February 10, 2003, stated "healed fractures of the 7th and 10th ribs are noted in axillary line.  There is no sign of bone destruction or acute fracture.  Impression: the fractures appear to have healed."  UACL 139.

70. Dr. Hundal's medical records for April 28, 2003, note depression, that Harper was "more sad, depressed, crying, sleep disturbance, and low self-esteem.," and referred Harper to a psychiatrist due to depression related to complaints of pain.  UACL 141, 152, 266.

71. On May 28, 2003, Dr. Lee performed an orthopedic review of Harper's records.  UACL 149-154.

72. Dr. Lee was asked to respond to the following questions: (1) whether the medical information supported impairment from the physical injuries claimant received as a result of the MVA accident beyond 10/17/02; (2) whether there are any restrictions and limitations and the duration of the restrictions and limitations; and (3) whether plaintiff is receiving

1    appropriate care and treatment.  UACL 149.

2    73. Dr. Lee summarized the records, including records for physical therapy in which it was noted

3    that Harper's condition had "improved significantly," Dr. Hundal's restrictions and

4    limitations from the APS, and that depression was an on-going diagnosis from October 2,

5    2002 until April 28, 2003 (the last available medical record) when Harper was "referred on

6    for persistent depression due to persistent pain complaints."  UACL 149-154.

7    74. Dr. Lee concluded that the medical records did not show impairment beyond October 17,

8    2002, for the physical injuries received in the Accident because, after October 17, Harper's

9    orthopedic care was mild/unchanged without intensification of therapy, there were not

10   referrals to subspecialists (neurology, orthopedist, pain management), the February 10 x-ray

11   showed healed ribs, Harper's diagnosis was unsupported other than by subjective complaints

12   of pain, and the records provided no understanding of what Harper can or cannot do.  UACL

13   153.

14   75. Dr. Lee answered the additional questions posed to her as follows:

15       There are no restrictions and limitations from an orthopedic standpoint supported
         to the file beyond 10/17/02.  Prior to this time, due to claimant's multiple
16       orthopedic injuries, it would be reasonable that claimant had restrictions and
         limitations in a time frame that benefits were provided.  As stated above, usual
17       resolution of restrictions and limitations for the orthopedic diagnoses are six to
         eight weeks.
18       . . . . . .

19       Prior to 10/17/02.  Claimant has received appropriate care and treatment for her
         orthopedic injuries consisting of nonsteroidal anti-inflammatory drugs, Vicodin for
20       pain management, and referral to physical therapy.  Restrictions and limitations
         beyond 10/17/02 are not supported based upon the orthopedic diagnoses.
21       Although claimant continues with chief complaints of pain beyond 10/17/02, this
         is inconsistent with the diagnoses of strain/sprain and musculoskeletal contusion.
22       Restrictions and Limitations for these diagnoses past 10/17/02 are not reasonably
         supported from these orthopedic diagnoses and there is no intensification of
23       therapy (please see analysis section above).  Claimant's subjective complaints are
         in excess of her objective findings.
24
         UACL 153-154.
25
     76. On June 9, 2003, Unum sent a letter to Harper that denied her appeal.  UACL 465-467.
26
     77. The denial letter summarized Drs. Doane, Lee and Higgins's respective conclusions; states
27
         that Harper was advised to return to work on October 17, 2002, but the office visit following
28

                                                    14

October 17, 2002, does not discuss why Harper did not return to work;[5] states that Harper had suffered from depression for over 10 years; and that the records doe not support impairment beyond October 17, 2002, on the basis of either an orthopedic or psychiatric perspective.  UACL 466-467.

78. The letter concluded that "the objective medical data does not support your subjective medical complaints.  We are unable to support any restrictions and limitations precluding your work activity beyond 10/17/02.  Therefore, we have no alternative but to uphold our prior decision."  UACL 467.

79. On July 3, 2003, Kerry returned a telephone call from Harper, who wanted to know if she could appeal the June 2003 decision.  Harper was very upset, i.e. speaking in low tones and crying.  Kerry learned that Harper had been advised for some months to see a psychiatrist, but could not do so due to insurance coverage.  Harper was to see a psychiatrist, Dr. Jones, that day.  Harper wanted to know if the claim could be re-opened.  Kerry told Harper to send in a letter of appeal and any medical information which may be relevant, including new psychiatric records.  UACL 293.

80. After the telephone call ended with Harper, Kerry called Dr. Jones's office because she was concerned for Harper.  Kerry related that she had spoken to Harper and that Harper spoke very low, was tearful, and was currently having psychotic episodes.  UACL 294.

81. In a letter dated July 8, 2003 (and received by Unum on July 14, 2003), Harper re-appealed and requested that Unum consider her case for income replacement benefits.  The letter states that her physical injuries have greatly improved, but that she had some residual pain in her neck, back, jaw, and left side.  The letter also states that her mental condition has dramatically declined in that: in the fall of 2002 she began to experience amnesia that lasted from several hours to a full day, the amnesia continues once every 7-10 days, she is taking Celexa and nortriptyline for depression, in April 2003 she began to hallucinate, she is

---

[5]Dr. Hundal's records do not appear to contain a notation that Harper was advised to return to work on October 17, 2002.  UACL 23-31, 261-274.  That date was identified by Dr. Hundal in the APS form, see UACL 55, and there is no indication that Hundal so told Harper.  However, there is no evidence that Harper ever told Unum that it was not true that she was told to return to work on October 17, 2002.

despondent, she is seeking psychiatric care under the advice of Dr. Hundal, and saw Dr. Jones on July 3 after having difficulty in finding a psychiatrist due to insurance coverage. Harper also states that she was terminated from her job as of June 15, 2003.  UACL 206.

82. On July 16, 2003, Kerry received Dr. Jones's medical records.  UACL 208.

83. The notes indicate that Dr. Jones believed that Harper had developed a psychotic disorder secondary to cerebral concussion.  Dr. Jones's psychiatric evaluation indicated that Harper related that she had hallucinations (including arms coming out of her computer and feet sticking out from her bed) which caused her significant fear.  The evaluation also indicates that Harper would sometimes go to her daughter's home out of fear, that her granddaughter was afraid to be around her, she does not like to speak to people over the telephone, and that she cannot stand to have people look at her (and asked Dr. Jones not to look at her as it made her very uncomfortable).  Jones indicated that there was no history of mental illness and that Harper's affect was tearfulness and depression.  Jones's notes also indicate that Harper told Dr. Hundal about missing a whole day in her life, and Dr. Hundal said that Harper was upset and gave her Ambien for sleep, which did not help.  UACL 211-214.

84. Dr. Jones did not find that Harper had a major depressive disorder, but instead diagnosed a psychotic disorder secondary to cerebral concussion.  UACL 211-214.

85. In making his diagnosis of psychotic disorder secondary to cerebral concussion, it does not appear that Dr. Jones reviewed any of Harper's medical records, including the CT scan performed on May 26, 2002; those records did not state that a concussion had been sustained.  UACL 34, 240-248.

86. On July 22, 2003, Kerry sent a letter to Harper that acknowledged receipt of Harper's request for an additional review of the STD claim.  UACL 198.

87. On July 29, 2003, Kerry returned a telephone call from Harper and confirmed that Unum had received Dr. Jones's records.  Harper asked if she could submit additional information, and Kerry stated that she could.  UACL 221.

88. On August 15, 2003, Kerry spoke to Harper to follow up on the new information that Harper stated would be forthcoming, but had not yet arrived.  UACL 222, 230.

89. On August 15, 2003, Kerry also wrote a letter to Harper to memorialize her telephone call. The letter included two medical release authorizations and stated, in part, "per our discussion, we would like to understand what prevented your work capacity from 10/2002 (the date your claim was approved through and denied) through present.  In order to better understand, we would need medical information from the provider which you have indicated you have been treating with every month through present, Dr. Hundal."  The letter also stated, "Please provide this letter to Dr. Hundal at your next office visit next week.  At this time, we are requesting all medical records from Dr. Hundal, including your treatment, restrictions and limitations from October 2002 through present.  Please request that Dr. Hundal forward this information as soon as possible . . ."  UACL 227.

90. On September 9, 2003, Unum received additional medical records from Dr. Hundal.  UACL 256.

91. Dr. Hundal's May 29, 2003, office visit note indicates that Harper told Dr. Hundal *inter alia* that she felt more sad and had hallucinated.  Dr. Hundal's impression was depression with a question of psychosis, and he advised Harper's daughter to take her to a behavioral medical center that day.  UACL 265.

92. May 29, 2003, appears to be the first time that hallucinations are mentioned in Dr. Hundal's medical notes/records, and it does not appear that Harper ever told Dr. Hundal about any periods of amnesia that first occurred during the Fall of 2002.  UACL 256-284.

93. Dr. Hundal's June 30, 2003, office visit note indicates that Harper was unable to see a psychiatrist due to insurance problems; her pain was improved but she was feeling sad and depressed with low self esteem.  Dr. Hundal's impression was depression secondary to stressors including pain and financial loss.  Dr. Hundal's note does not reflect any reports of hallucinations.[6]  UACL 264.

94. Dr. Jones's July 10, 2003, office visit note indicates that Harper was doing better and that

---

[6]There are also notes from Dr. Hundal for office visits on July 23, 2003, and August 28, 2003.  UACL 261, 262.  However, the notes are very difficult to discern and neither party specifically mentions or discusses these particular office visits.

1    she only had one hallucination since starting a new medication (on July 3), she was

2    concerned about increased appetite, and she was having trouble sleeping.  Dr. Jones states

3    that he feels Harper had a psychotic reaction due to a head injury.  UACL 248.

4  95. Dr. Jones's July 24, 2003, office visit note indicates that Harper was doing better and that

5    her hallucinations are much less often, are less foreboding, and shorter in duration.  The

6    notes indicate that Harper's family and friends do not understand the nature of a concussion.

7    UACL 247.

8  96. On September 9, 2003, Unum had Dr. Zimmerman, a clinical neuropsychologist, review

9    Harper's file.  UACL 303.

10 97. Dr. Zimmerman was asked whether the new medical information from Dr. Jones, combined

11   with prior medical information, support psychiatric impairment beyond 10/17/02 and also to

12   provide restrictions and limitations from a psychiatric standpoint.  Dr. Zimmerman was also

13   asked to contact Dr. Hundal for a "doc to doc" call in which Zimmerman was to ask Hundal:

14   (1) to describe Harper's psychiatric condition and treatment from 10/2002 to present, (2) was

15   Harper's referred to a psychiatric provider (why or why not) and whether she attended

16   psychiatric treatment during this time, (3) whether Harper's psychological condition was

17   severe in 10/2002 and on going, (4) what prevented Harper from working from 10/2002 to

18   present, and (5) what are Harper's restrictions and limitations from 10/2002 to the present.

19   UACL 302.

20 98. Dr. Zimmerman's report stated in part:

21   There was no documentation from the emergency room physician.  However, there was
     no evidence of indicators of mild head injury/concussion or post-concussive syndrome
22   in the available documentation.  The claimant's report to Dr. Hundal that she had no loss
     of consciousness after the accident and was seen in the ER but not hospitalized.  The
23   brain CT was normal with right frontal scalp injury indicated per available records.
     . . . .

24
     When seen a few days later by Dr. Jones, her reported symptoms were inconsistent with
25   her prior reports to her medical providers and correspondence {to Unum} (e.g., there
     was no reference in Dr. Hundal's available documentation of an amnestic even and sleep
26   disturbance beyond not sleeping well often associated with pain and position in
     generally monthly contacts from 10/02 through 8/03 in contrast to her report to Dr.
27   Jones that she told Dr. Hundal of her loss of a day in the fall and cycle of going for days
     without sleep then sleeping 18-24 hours; she reported a 10 year history of diabetes,
28   depression, and GERD to Dr. Elsakr vs. report that diabetes and [GERD] had developed

18

since the accident and denial of history of psychiatric illness to Dr. Jones; her reports to both Drs. Hundal and Jones contrasted with her letter that cited amnestic events every 7-10 days or more and hallucinations every 4-6 days).  In addition, her presentation was inconsistent as she did not report her discomfort with other people looking at her or talking with her over the phone to Drs. Hundal or Elsakr per the available documentation and they did not comment that she seemed uncomfortable with them or asked them not to look at her in contrast to her request to Dr. Jones that he not look at her as it made her very uncomfortable.  Her complaints on follow-up were inconsistently reported to her providers (e.g. the added symptom of unspecified hallucinations reported to Dr. Hundal on 5/29/03 was not referenced in follow-ups on 6/30/03, 7/23/03, or 8/28, 03 in contrast to the visual hallucinations reported to Dr. Jones as present on 7/3/03 were improved to the point of one reported on 7/10/03 and fewer that were less frightening and foreboding on 7/24/03.

There was no discussion of the possible contribution of chronic narcotic use and medication interaction effect in an individual who reported unusual visual hallucinations of arms coming out of a computer and legs sticking out from under the bed.  Dr. Jones seemed unaware that she was taking Vicodin for pain.

There was no expected neurological and neuropsychological consultations in an individual reporting unexpected delayed onset of episodic amnestic events and hallucinations attributed to remote motor vehicle accident.

There was no objective assessment of decreased concentration.  The claimant's well-written and detailed correspondence was not suggestive of an individual impaired from a cognitive or psychiatric condition.

UACL 314.

99. Dr. Zimmerman wrote that restrictions and limitations from a psychiatric standpoint were

"NA," and also opined that:

[Harper] is reportedly depressed in response to residual pain from the [car crash] as of 10/2/02.  However, there is no evidence of serious psychiatric symptomatology that would be considered impairing in the documentation from 10/2/02 through 4/28/03.  The indication of inconsistency and exaggeration of complaints first presented on 5/29/03 prevents an accurate understanding of the claimant's psychiatric status.

UACL 314.

100   There is no evidence that Dr. Zimmerman contacted or spoke to Dr. Hundal.

101   On September 25, 2003, Kerry sent Harper a letter that affirmed the prior appeal and finally

denied benefits.  UACL 305-310.

102   The September 25 letter explains that the medical department's

neuropsychologist/psychologist completed a review of Harper's files, including new

information from Drs. Jones and Hundal.  The denial letter states the Plan's definition of

"disabled" and then summarizes the medical records and the submissions by Harper,

including the records from Dr. Jones.  The letter states in part that "[c]laim file

documentation reveals you were terminated from your position as of 6/15/03."  UACL 306-

307.

103   The letter then explains that a finding of disability cannot be made:

> . . . please be reminded that your [STD] claim was previously approved
> through 10/17/02, therefore, further consideration was for beyond 10/17/02.
> It is our Medical Department's analysis that you reported a long-standing 10
> year history of depression per Dr. Elsakr.  However, there was no reference
> to any depressive symptoms on your follow-up visit on 10/17/02 with Dr.
> Hundal.  With the exception of the report that your depression was better
> with Celexa on 11/8/02, there were no further references to depressive
> symptoms until 4/28/03 (or eleven months post injury) when you were
> reportedly more depressed with symptoms considered secondary to pain.
> You did not follow up on the psychiatry referral on that date, and instead
> returned one month later with additional symptoms of unspecified
> hallucinations.  You daughter was advised to take you for a psychiatric
> evaluation that date.  You had not been evaluated by a Psychiatric provider
> until 7/2003 when you were seen by Dr. Henry Jones.  There were no
> documented hospitalizations for the period of 10/17/02 through present.
> There were no documented discussion of the possibility of contribution of
> chronic narcotic use and medication interaction effects in an individual who
> reported unusual visual hallucinations of arms coming out of a computer and
> legs sticking out from under the bed.  Dr. Jones seemed unaware that you
> were taking Vicodin for pain.  There was no expected neurological and
> neuropsychological consultations in an individual reporting unexpected
> delayed onset of episodic amnestic events and hallucinations attributed to
> remote motor vehicle accident.  There was no objective assessment of
> decreased concentration.
>
> In addition, our Physician opines that your well-written and detailed
> correspondence was not suggestive of an individual impaired from a
> cognitive or a psychiatric condition.
>
> In conclusion, there is no evidence of a serious psychiatric symptomatology
> that would be considered impairing in the documentation from 10/02/02
> through 4/28/03.  It is our Medical Department's opinion that the medical
> records did not substantiate a level of impairment beyond 10/17/02 that
> would preclude you from performing the duties of your occupation as a
> Communications Manager.
>
> While you may have documented psychiatric symptoms beyond 4/28/03, the
> medical evidence does not support ongoing disability beyond 10/17/02
> through 4/28/03.

UACL 308.

104   The letter then quoted two sections of the Plan, one for when payments would end and

another for when coverage ends.  The letter stated that coverage ends the earlier of: (1) the

date the Plan is cancelled; (2) the date Harper is no longer in an "eligible group;" (3) the date

the eligible group is no longer covered; (4) the last day of the period of which "you made any

requried contributions," and (5) "the last day you are in active employment except as

provided under the covered leave of absence provision."  UACL 309.

105   The letter then stated:

> Our records indicate you reported losing your job to Dr. Hundal on 11/2002.
> Since you were no long determined disabled according to the policy
> provisions noted above beyond 10/17/02, your coverage also ended when
> your job terminated.
>
> Therefore, in addition to our prior decision of 6/9/03 . . ., and in the absence
> of medical documentation to substantiate a state of disability existed or any
> restrictions and limitations which support you inability to perorm your
> occupation beyond 10/17/02, we are unable to provide further benefits.
>
> Please be advised that all administrative remedies have been exhausted, and
> this decision represents our final appellate review.
>
> UACL 309.

106   Harper next contacted Unum on March 17, 2004, and spoke to Kerry.  Harper stated that

the assertion that she had a "10 year history with depression" was inaccurate.  Harper also

asked about appealing to through the State of California.  Kerry encouraged Harper to obtain

a copy of the claims file and gave Harper the address and Kerry's fax number for that

purpose.  UACL 318.

107    No doctor opined that Harper was disabled due to depression or that her depression caused

restrictions and limitations in the kind of work activity that Harper could perform.

108    There is no indication that, after April 29, 2003 (the date that Unum contacted Perot

systems to verify coverage), Unum ever attempted to determine when Harper was terminated

despite her assertions that she was terminated on 6/15/03.

109   No evidence has been submitted that discusses the material aspects of Harper's job, other

than it was classified as "light work."

110    On October 17, 2002, Harper was not yet eligible for LTD benefits based on the Accident,

but did have several weeks of eligibility for continued STD benefits.

111    Unum has a documented history of biased claims administration.  See Saffon v. Wells

Fargo & Co. Long Term Disability Plan, 511 F.3d 1206, 1210 (9th Cir. 2008); Cowder-

1  <u>Cowin v. Unum Life Ins. Co. of Am.</u>, 560 F.Supp.2d 1006, 1013 (W.D. Wash. 2008); <u>see</u>

2  <u>also</u> <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343, 2351 (2008) (citing John H.

3  Langbein, Trust Law As Regulatory Law: The UNUM/Provident Scandal and Judicial

4  Review of Denials Under ERISA, *101 Nw. U. L. Rev.* 1315 (2007)).

5  112.  In her operative complaint, Harper alleges:

6  That notwithstanding the contractual obligation to do so under the Plan, [Unum] has
   failed and refused and continues to fail and refuse[s] to pay the STD Plan benefits from
7  October 17, 2002, and to pay [Harper] the LTD Plan benefits to which [Harper] is
   entitled under the Income Replacement Policy she was provided by her employer.
8  Rather, [Unum] continues to claim that there was no objective medical evidence of
   [Harper's] disability despite the attending physician clarifying that [Harper] was
9  disabled from May 26, 2002, to December 8, 2002, and thereafter to claim that the
   symptoms are self reported and therefore pathological and not real; that the symptoms
10 are not serious enough to prevent [Harper] from returning to work even though [Unum]
   does not have a description of [Harper's] job duties; that the attending physician is not
11 clear in describing the basis for [Harper's] disability; and deliberately misrepresenting
   entries in [Harper's] medical records to deny lawful, contractual responsibilities to
12 [Harper] under the Plan.

13 That the denial of benefits to [Harper] constitutes a breach of the Plan between [Unum]
   and [Harper]. [Harper] seeks reimbursement and compensation for any and all benefits
14 she is properly entitled to receive pursuant to the Plan, but has been wrongfully denied
   since at least October 16, 2002, to present.

15 First Amended Complaint at ¶¶ 32-33.

16

17    **Conclusions of Law**

18
19 1.  Under the abuse of discretion standard, reversal of a plan administrator's determinations is

20    appropriate if they are arbitrary and capricious.  <u>See</u> <u>Jordan v. Northrop Grummon Corp.</u>

21    <u>Welf. Benefit Plan</u>, 370 F.3d 869, 875 (9th Cir. 2004); <u>Schikore v. BankAmerica</u>

22    <u>Supplemental Ret. Plan</u>, 269 F.3d 956, 961 (9th Cir. 2001).  The "decision to deny benefits

23    must be upheld under the abuse of discretion standard if it is based upon a reasonable

24    interpretation of the plan's terms and if it was made in good faith."  <u>McDaniel v. Chevron</u>

25    <u>Corp.</u>, 203 F.3d 1099, 1113 (9th Cir. 2000); <u>Bendixen v. Standard Ins. Co.</u>, 185 F.3d 939,

26    944 (9th Cir. 1999).  Under ERISA, even decisions directly contrary to evidence in the

27    record do not necessarily amount to an abuse of discretion."  <u>Taft v. Equitable Life Assur.</u>

28    <u>Soc'y</u>, 9 F.3d 1469, 1473 (9th Cir. 1993).  A decision "grounded on any reasonable basis is

not arbitrary or capricious." Jordan, 370 F.3d at 875.  "An ERISA administrator abuses its

discretion only if it (1) renders a decision without explanation, (2) construes provisions of

the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly

erroneous findings of fact." Boyd v. Bell, 410 F.3d 1173, 1178 (9th Cir. 2005); Bendixen,

185 F.3d at 944.  "A finding is 'clearly erroneous' when, although there is evidence to

support it, the reviewing [body] on the entire evidence is left with the definite and firm

conviction that a mistake has been committed." Boyd, 410 F.3d at 1178.  "The mere fact

that the plan administrator's decision is directly contrary to some evidence in the record does

not show that the decision is clearly erroneous." Snow v. Standard of Life Ins. Co., 87 F.3d

327, 331 (9th Cir. 1996).[7]  The clearly erroneous standard "does not permit the overturning

of a decision where there is substantial evidence to support the decision, that is, where there

is relevant evidence that reasonable minds might accept as adequate to support a conclusion

even if it is possible to draw two inconsistent conclusions from the evidence." Wells v.

Reliance Std. Life Ins. Co., 2008 U.S. App. LEXIS 14430, *3 (9th Cir. July 3, 2008); Snow,

87 F.3d at 331.

2.  "Abuse of discretion review applies . . . even if the administrator has a conflict of interest."

Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (9th Cir. 2006).  Although not as

clear as a case in which an employer funds and administers a plan, an inherent or structural

conflict of interest exists when an insurer acts as both the plan administrator and the funding

source for benefits.  Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2349-50 (2008);

Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511 F.3d 1206, 1212 (9th Cir.

2008); Abatie, 458 F.3d at 965.  When such an inherent conflict exists, the district court

must consider that conflict in determining whether the plan administrator abused its

discretion.  See Glenn, 128 S.Ct. at 2350-51; Saffon, 511 F.3d at 1211; Abatie, 458 F.3d at

967.  That is, the court "must determine the extent to which the conflict influenced the

administrator's decision and discount to that extent the deference [it] accord[s] the

---

[7]Overruled on other grounds by Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999) (en banc).

administrator's decision." <u>Saffon</u>, 511 F.3d at 1212. The Ninth Circuit has explained:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

<u>Abatie</u>, 458 F.3d at 967-68 (citations omitted). Similarly, the Supreme Court has very recently explained that reviewing courts must:

> take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion. . . . [C]onflicts are but one factor among many that a reviewing judge must take into account. . . . [T]he word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. . . . In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

<u>Glenn</u>, 128 S.Ct. at 2350-51. These considerations aide the court in "making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." <u>Saffon</u>, 511 F.3d at 1212; <u>Abatie</u>, 458 F.3d at 969. "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest . . . ." <u>Abatie</u>, 458 F.3d at 970; <u>see also</u> <u>Tremain v. Bell Idus.</u>, 196 F.3d 970, 976-77 (9th Cir. 1999).

3.   Generally, under an abuse of discretion review, "a district court may consider only evidence within the administrative record at the time of the administrator's decision." <u>Silver v. Exec. Car Leasing Long-Term Disability Plan</u>, 466 F.3d 727, 732 n.2 (9th Cir. 2006); <u>see also</u> <u>Taft v. Equitable Life Assur. Soc'y</u>, 9 F.3d 1469, 1471 (9th Cir. 1993); <u>Sandoval v. Aetna Life</u>

and Cas. Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992).  However, even when abuse of discretion review applies, "the court may take additional evidence when [procedural] irregularities have prevented full development of the administrative record." Abatie, 458 F.3d at 973.  Further, if a plan administrator labors under a conflict of interest, the court "may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established . . . ."[8]  Id. at 970.

4.   A court may consider the failure of an employee's physician to respond to inquiries by the plan administrator.  Jordan, 370 F.3d at 878; Nord v. Black & Decker Disability Plan, 356 F.3d 1008, 1010 (9th Cir. 2004).  Also, "a treating physician's opinion gets no special weight and can be rejected on the basis of reliable evidence with no discreet burden or explanation." Jordan, 370 F.3d at 879 (explaining Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)).  Further, a procedural irregularity committed by the plan administrator "is a matter to be weighed in deciding" whether an abuse of discretion has occurred.  Abatie, 458 F.3d at 972.  Like conflicts of interest, more serious procedural irregularities should be weighed more heavily, but when there is "ongoing, good faith exchange of information between the administrator and the claimant, the court should give an administrator's decision broad deference notwithstanding a minor irregularity."  Id.

5.   Abuse of discretion is the proper standard of review in this case.  See Court's Docket Doc. No. 34.

---

[8]Harper submitted several exhibits that were outside the administrative record and has referenced certain Bates stamped documents that were never submitted to the Court.  Unum has objected to consideration of these materials, except for a copy of the LTD Plan.  See Court's Docket Doc. No. 53.  The additionally provided documents to which Unum objects are: a letter from Harper's employer stating that Harper lost Family and Medical Leave protection, a termination letter, and two letters from Dr. Jones.  It does not appear that these documents shed light on the nature or extent of Unum's conflict, nor do they shed much light on the effect of such a conflict.  The Court will conclude, irrespective of the extrinsic evidence, that reliance on a November 2002 termination date is not sufficiently supported and that the opinions of the Unum physicians are sufficient to support Unum's conclusion that Harper was no longer continuously disabled after October 17, 2002, irrespective of Dr. Jones's opinion. Accordingly, the Court will sustain Unum's objections to the extrinsic evidence.  See Silver, 466 F.3d at 732 n.2; Abatie, 458 F.3d at 970.  As for the referenced but not produced Bates stamped documents that are alleged by Unum to be outside of the administrative record, since those documents were never produced, the Court could not and did not review or rely on them in any way.

6.  Unum violated 29 C.F.R. § 2560.503-1(f)(3) when it failed to deny Harper's claim, or even to communicate with Harper, between November 11, 2002, and January 31, 2003. See 29 C.F.R. § 2560.503-1(f)(3).

7.  Because the Plan is funded through insurance policies issued by Unum and Unum administers the Plan, Unum labors under a structural conflict of interest. See Saffon, 511 F.3d at 1211.

8.  Unum did not thoroughly investigate the material aspects of Harper's job as a Communications Manager because it simply relied on a general description of the job as "light work."

9.  Unum engaged in a procedural violation by stating in the final September 2003 denial letter that no further appeals were possible and then adding a ground that had not been previously relied upon: that Harper had lost her job on November 2, 2002. See Abatie, 458 F.3d at 974.

10. Because of the violation of 29 C.F.R. § 2560.503-1(f)(3), Unum's structural conflict of interest, the failure to determine the material aspects of Harper's job beyond a general description as "light work," Unum's addition of a new ground for denial in the final denial letter, and Unum's documented history of biased claims handling, the Court will view Unum's decision with a medium to high level of scepticism. See Glenn, 128 S.Ct. at 2350-51; Abatie, 458 F.3d 967-68.

11. The apparent reliance on a finding that Harper lost her job in November 2002 does not support Unum's decision to deny benefits because it is contrary to the clear representations made by Harper that she was terminated on June 15, 2003, it is contrary to Unum's April 29, 2003, data entry that Perot Systems was contacted to confirm STD/LTD eligibility, and there is no evidence that Unum did any investigation after April 2003 to determine the true termination date.

12. Nevertheless, Unum did not abuse its discretion when it upheld the decision to deny (March 11, 2003) continuing STD benefits beyond October 17, 2002, and when it affirmed that decision on both appeal (June 9, 2003) and re-appeal (September 25, 2003).

13. From October 17, 2002, Harper failed to establish that she was continuously disabled

because she did not provide sufficient evidence that she was impaired or limited or restricted in the activities that she could perform.  The APS form that was filled out by Dr. Hundal did not identify any restrictions but instead said that Harper could do anything she was "able to do," stated that her condition would fundamentally change in 1 to 2 months, stated that she would recover in one month, and stated that she could return to work on October 17, 2002.  UACL 55.  After October 17, 2002, Unum told Harper that it required information that identified limitations and restrictions, the medical rationale for the restrictions, and a treatment and return to work plan.  Dr. Hundal's November 11, 2002, letter did not provide this information.  In the January 31, 2003, letter, Unum explained to Harper why Dr. Hundal's November 11, 2002, letter was insufficient and told Harper to show the letter to Dr. Hundal, presumably so that Dr. Hundal could provide appropriate information.  Despite the January 31, 2003, letter, the deficiency of the November 11 note was never cured.  Dr. Hundal never identified any restrictions or limitations or any medical basis for restrictions and limitations.  Further, Nurses Palmer and Ryer, and Drs. Doane, Higgins, Lee, and Zimmerman never identified any restrictions or limitations that were supported by the medical records.  Drs. Doane and Lee stated that the physical injuries sustained by Harper (contusions, sprains, strains, and fractures) would have resolved within six to eight weeks.  Drs. Doane and Lee acknowledged that some discomfort may remain after six to eight weeks, but would not rise to the level of an impairing condition.[9]  Dr. Lee further noted that there were no referrals to specialists or an increase in the treatment received by Harper and that Harper's subjective complaints were in excess of the objective findings.  In the records from October 2002 through November 2002, Dr. Higgins did not find evidence of a psychiatric condition that would be impairing.  Dr. Zimmerman did not find evidence of a psychiatric condition that could be considered impairing from October 2002 through April 29, 2003.  Further, Dr. Zimmerman indicated inconsistent reporting by Harper in that she never told Dr. Hundal about experiencing amnesia, did not mention hallucinations to Dr.

[9]Unum had approved STD benefits for a period substantially longer than 6 to 8 weeks; benefits were given from May 26, 2002, through October 16, 2002.

Hundal until May 29, 2003, did not express any discomfort to Dr. Hundal about communicating over the telephone, and did not tell Dr. Hundal or Dr. Elsakr that she was uncomfortable with people looking at her.[10]  Additionally, Dr. Hundal did not file a letter to support Harper's appeal, despite the fact that Harper said in her March 30, 2003, letter that she would talk to Dr. Hundal about providing such support.  On May 2, 2003, an employee from Dr. Hundal's office stated that Dr. Hundal would not send a letter of support, but would send medical records.

14.  Because after October 17, 2002, (1) Harper provided only a subjective list of limitations, Harper did not provide any medical rationale for the subjective limitations, (2) Dr. Hundal never provided any restrictions, (3) Dr. Hundal did not provide a list of further limitations or the medical rationale for limitations after September 2002, (4) Dr. Hundal did not support the assertions made by Harper in the letter of March 30, 2003, (5) Drs. Doane, Higgins, Lee, and Zimmerman could find no supportable restrictions and limitations from the medical records provided, and (6) these physicians indicated that Harper's subjective complaints were not supported by the objective data, Unum had a reasonable basis for concluding that Harper was no longer continuously disabled, i.e. she was not restricted or limited or impaired, after October 17, 2002.[11]

15.  Harper's claim, which was filed on August 26, 2002, and which was based on the May 26, 2002, Accident, ended on October 17, 2002.  The Plan states that Unum will send payments during a period of continuous disability and that payments will stop and a claim ends when a claimant is no longer disabled.  Harper's August 2002 claim ended because no medical evidence indicated that she remained continuously disabled after October 17, 2002.

---

[10]Further, Dr. Zimmerman noted that the medical records were not consistent with a concussion/post-concussion syndrome relating to the Accident; thus, Dr. Jones's diagnosis is questionable.

[11]To the extent that Dr. Jones opined that Harper was continuously disabled from October 17, 2002, to the present, Unum had a reasonable basis for rejecting this opinion: it does not appear that Dr. Jones reviewed the CAT scan findings, and symptoms revealed to Dr. Jones by Harper were either never reported to another health care provider or not reported until late April and May 2003.

16. Harper has not shown that she is entitled to LTD benefits.[12]  Unum did not make an LTD benefits determination or conduct an LTD review.  Unum informed Harper that it was reviewing her claim for STD benefits and reviewed the STD determination on appeal and re-appeal.

17. Because Unum did not abuse its discretion, it is entitled to judgment in this case.


      Accordingly, IT IS HEREBY ORDERED that the Clerk will enter judgment in favor of Defendant and against Plaintiff, and will close this case.


IT IS SO ORDERED.

**Dated:   December 17, 2008**          /s/ Anthony W. Ishii
CHIEF UNITED STATES DISTRICT JUDGE

---

[12]Harper takes the position that the period of time in which she reportedly suffered from hallucinations (April 28, 2003) may be added to the time from May 26, 2002 through October 16, 2002, and that this combined time period would exhaust STD benefits and make her entitled to LTD benefits.  See Harper's Trial Brief at 19:24-20:3.  However, the Plan indicates that STD benefits will be sent weekly up to the maximum period of payment, which is either 120 or 150 days "during a continuous period of disability."  UACL 182-183.  In other words, the Plan is based on a continuous disability.  Harper's theory appears contrary to the terms of the STD Plan and Harper has not adequately supported or developed her "combining" theory.